# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARK III MEDIA, INC., a Wyoming corporation; and WYOMEDIA CORP., a Wyoming corporation. | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. N25C-05-343-PRW CCLD |
| BIG HORN TELEVISION LLC, a Delaware limited liability company; and FRONT RANGE TELEVISION LLC, a Delaware limited liability company, | ) ) ) ) ) ) | |
| Defendants. | ) | |

Submitted: December 2, 2025
Decided: February 27, 2026

*Upon Plaintiffs' Motion for Summary Judgment,*
**DENIED**.

*Upon Defendants' Cross-Motion for Partial Summary Judgment,*
**GRANTED.**

## MEMORANDUM OPINION AND ORDER

Thomas E. Hanson, Jr., Esquire (*argued*), BARNES & THORNBURG LLP, Wilmington, Delaware, *Attorney for Plaintiffs Mark III Media, Inc. and Wyomedia Corp.*

Lakshmi A. Muthu, Esquire, and Michael A. Laukaitis, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Charles George, Esquire (*argued*), WYRICK ROBBINS YATES & PONTON LLP, Raleigh, North Carolina, *Attorneys for Defendants Big Horn Television LLC and Front Range Television LLC.*

**WALLACE, J.**

Access is fundamental to the use of real property. In most settings, access is assumed: a parcel one buys abuts a public thoroughfare, the right and ability to enter it follows naturally. In more remote regions—where federal tracts stretch for miles and privately owned land is interlaced with federal property[1]—access may depend not on geography alone, but on easements, licenses, and government approval. This case centers not on the physical ability to reach land, but the contractual representation of the right to do so.

Plaintiffs Mark III Media, Inc., and Wyomedia Corp. sold twelve broadcast television stations to Defendants Big Horn Television LLC and Front Range Television LLC via two asset purchase agreements.[2] Amongst the assets sold were particular sites in the State of Wyoming.[3] The parties now disagree on the contractual provisions addressing access to those locations.[4]

---

[1] *See, e.g.*, *Iron Bar Holdings, LLC v. Cape*, 674 F. Supp. 3d 1059 (D. Wyo. 2023), *aff'd*, 131 F.4th 1153 (10th Cir. 2025).

[2] Compl., at ¶ 1 (D.I. 1). Plaintiff Mark III Media, Inc. is a Wyoming corporation with its principal place of business located in Casper, Wyoming. Compl. at ¶¶ 1, 5. Plaintiff Wyomedia Corp. is likewise a Wyoming corporation with its principal place of business located in Casper, Wyoming. Compl. ¶¶ 1, 6. They will be collectively referred to as "Sellers." Defendant Big Horn Television LLC is a Delaware Limited Liability Company. Compl. ¶ 7. Defendant Front Range Television LLC is likewise a Delaware Limited Liability Company. Compl. ¶ 8. They will be collectively referred to as "Buyers."

[3] *See generally* Compl.; Defendants' Answer to Plaintiffs' Complaint and Counter Claim (D.I. 5) [hereinafter "Defs.' Countercl."].

[4] *See generally* Compl.; Defs.' Countercl.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. FACTUAL BACKGROUND

On October 7, 2019, Mark III and Big Horn entered into an Asset Purchase Agreement (the "Mark III APA")[5] through which Mark III sold five broadcast television stations and assets used for their operation to Big Horn.[6] The total purchase price was $10,733,333 with $1,111,715 of the purchase price placed into escrow.[7] On the same day, Wyomedia and Front Range entered into a separate Asset Purchase Agreement (the "Wyomedia APA").[8] Wyomedia sold seven broadcast television stations and assets used for their operation to Front Range.[9] The total purchase price was $1,766,667, plus the assumption of certain assumed liabilities; $182,990 of this purchase price was placed into escrow.[10]

Central to this dispute are two transmission sites used in the operation of the television stations: the Carbon County Site and the Rawlins Hill Site.[11]

The Carbon County Site was conveyed by Mark III to Big Horn under the

---

[5]   Compl. ¶ 13; Defs.' Countercl. 5–6; Compl. Ex. A [hereinafter "Mark III APA"].

[6]   Compl. ¶ 13; Defs.' Countercl. 5–6; Mark III APA.

[7]   Compl. ¶ 13; Defs.' Countercl. 5–6; Mark III APA § 2.3.

[8]   Compl. ¶ 14; Defs.' Countercl. 6–7; Compl. Ex. B [hereinafter "Wyomedia APA"].

[9]   Compl. ¶ 14; Defs.' Countercl. 6–7; *see generally* Wyomedia APA.

[10]   Compl. ¶ 14; Defs.' Countercl. 6–7; Wyomedia APA § 2.3.

[11]   *See generally* Compl.; Defs.' Countercl.

Mark III APA.[12]  Located in Carbon County, Wyoming, the site sits in a remote area and is reached via an approximately 20-mile roadway that originates at a public road and crosses a patchwork of public and private lands.[13]  Upon closing, Big Horn didn't have legal entry on to the site nor did it have a Conditional Use Permit to allow for its operation.[14]  The Parties dispute whether Mark III represented that both would be available upon closing.[15]

The Rawlins Hill Site was transferred by Wyomedia to Front Range under the Wyomedia APA.[16]  Wyomedia had historically operated at this location pursuant to a Communications Use Lease with the United States Department of Interior's Bureau of Land Management (the "BLM").[17]  But that lease had expired several years before the transaction closed.[18]  After the expiration, Wyomedia remained in possession and continued paying annual rent to the BLM.[19]  The Parties dispute whether Wyomedia's representations in the APA were breached by the failure to

---

[12]  *See generally* Mark III APA § 4.12(d), Schedule 4.12(d).

[13]  Compl. ¶ 26; Defs.' Countercl. ¶ 14; *see generally* Pls.' Op. Br. MSJ Ex. K.

[14]  Compl. ¶¶ 26–33; Defs.' Countercl. ¶¶ 26–28; Defendants' MSJ, Ex. D § 3(a) (D.I. 21) [hereinafter "Amendment to Mark III APA"].

[15]  Compl. ¶¶ 26, 33; Defs.' Countercl. ¶¶ 18, 26–28.

[16]  *See generally* Wyomedia APA § 4.12, Schedule 4.12(c) (Updated Schedules).

[17]  Compl. ¶¶ 36–38; Defs.' Countercl. ¶¶ 35–38.

[18]  Compl. ¶¶ 36–38; Defs.' Countercl. ¶¶ 35–38; *see generally* Defs.' Op. Br. PMSJ, Ex. BB.

[19]  Compl. ¶¶ 36–38; Defs.' Countercl. ¶¶ 35–38; *see generally* Defs.' Op. Br. PMSJ Ex. BB.

deliver a valid lease at closing.[20]

Together, these two properties give rise to three core legal issues: (1) whether Mark III breached its representation regarding access to the Carbon County Site; (2) whether Mark III is obligated to reimburse Big Horn for Conditional-Use-Permit-related costs; and (3) whether Wyomedia breached its representations and warranties in the Wyomedia APA by failing to convey a valid leasehold interest in the Rawlins Hill Site.[21]

On June 2, 2021, Big Horn and Front Range issued a Notice of Claim against the funds awaiting release in escrow.[22]  As a result, $425,104.74 in escrow was not released to Mark III and Wyomedia.[23]

## B. PROCEDURAL BACKGROUND

Mark III and Wyomedia filed a verified complaint in the Delaware Court of Chancery asserting two claims arising from the parties' asset purchase agreements: Count I, for declaratory judgment concerning the interpretation and enforcement of the agreements, and Count II, for breach of contract.[24]  Sellers also sought specific performance compelling release of escrowed funds.[25]  Big Horn and Front Range

---

20   Wyomedia APA § 4.12(c); Compl. ¶¶ 36–38; Defs.' Countercl. ¶¶ 35–38.

21   *See generally* Pls.' Op. Br. MSJ; Defs.' Op. Br. PMSJ.

22   Compl. Ex. E (D.I. 1).

23   Compl. ¶¶ 39–40; Defs.' Countercl. 16–17.

24   *See generally* Compl.

25   *See generally id.*

answered and asserted counterclaims, including Counterclaim Count I, for breach of contract, and Counterclaim Count II, for declaratory judgment.[26]

The Court of Chancery determined it lacked subject matter jurisdiction because Sellers had an adequate remedy at law and specific performance was not warranted.[27] The action was transferred to this Court.[28] And the parties have since filed cross-motions for summary judgment.[29]

## II. PARTIES' CONTENTIONS

The Parties agree that the material facts are largely undisputed; the contest now concerns the proper interpretation of the two APAs and whether, under the undisputed record, either party is entitled to judgment as a matter of law.[30] Sellers seek judgment in their favor on Complaint Counts I (Declaratory Judgment) and II (Breach of Contract).[31] Buyers seek partial summary judgment on Counterclaim Counts I (Breach of Contract) and II (Declaratory Judgment).[32]

Sellers contend that they breached no representations or warranties related to

---

[26] *See generally* Defs.' Countercl.

[27] D.I. 26 (Transfer from Chancery Court – Letter Decision Dismissing Case For Lack of Subject Matter Jurisdiction).

[28] *Id.*; *see* DEL. CODE ANN. tit. 10, § 1902 (2025).

[29] *See generally* Pls.' Op. Br. MSJ; Defs.' Op. Br. PMSJ.

[30] *See generally* Pls.' Op. Br. MSJ; Defs.' Op. Br. PMSJ.

[31] *See generally* Pls.' Op. Br. MSJ.

[32] *See generally* Defs.' Op. Br. PMSJ.

the Carbon County Site or the Rawlins Hill Site.[33] Specifically, Sellers maintain that the Mark III APA didn't obligate them to provide access to the Carbon County Site nor are the Sellers, at this time, obligated to assist in obtaining a Conditional Use Permit.[34] Sellers further assert that they satisfied their contractual obligations concerning access to, and a lease for, the Rawlins Hill Site.[35] On that basis, Sellers argue that Buyers wrongfully refused to authorize release of the escrowed funds and that Sellers are entitled to declaratory relief, damages, release of the escrow, and attorneys' fees pursuant to the agreements.[36]

Buyers, relying on much of the same factual record, argue the opposite.[37] Buyers contend that the undisputed facts establish that Sellers breached certain of the APAs' representations and warranties.[38] Buyers therefore seek a determination of liability as a matter of law, with damages to be resolved in further proceedings.[39] Buyers also assert that they are entitled to attorneys' fees as the prevailing party, although any award would be determined at the conclusion of the action.[40]

---

[33] *See generally* Pls.' Op. Br. MSJ.

[34] *See id.* at 7–21, 26–37.

[35] *Id.* at 1–23, 38–39.

[36] *See generally* Pls.' Op. Br. MSJ; Defs.' Op. Br. PMSJ.

[37] *See generally* Defs.' Op. Br. PMSJ.

[38] *See generally id.*

[39] *See generally id.*

[40] *See generally id.* at 80.

## III. STANDARD OF REVIEW

Summary judgment is warranted "'if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits' show 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"[41] The movant bears the initial burden of proving its motion is supported by undisputed facts.[42] If the movant meets its burden, the non-movant must show there is a "genuine issue for trial."[43] To determine whether a genuine issue exists, the Court construes the facts in the light most favorable to the non-movant.[44]

"These well-established standards and rules for summary judgment apply in full when the parties have filed cross-motions for summary judgment."[45] Filing cross-motions for summary judgment doesn't act *per se* as a concession that there are no genuine factual disputes.[46] "But, where cross-motions for summary judgment

---

[41] *Options Clearing Corp. v. U.S. Specialty Ins. Co.*, 2021 WL 5577251, at *7 (Del. Super. Ct. Nov. 30, 2021) (quoting Del. Super. Ct. Civ. R. 56(c)).

[42] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

[43] Del. Super. Ct. Civ. R. 56(e); *see also Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995) ("If the facts permit reasonable persons to draw but one inference, the question is ripe for summary judgment.").

[44] *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005).

[45] *Radulski v. Liberty Mut. Fire Ins. Co.*, 2020 WL 8676027, at *4 (Del. Super. Ct. Oct. 28, 2020); *see also Sarraf 2018 Fam. Tr. v. RP Holdco, LLC*, 2022 WL 10093538, at *5 (Del. Super. Ct. Oct. 17, 2022); *Zenith Energy Terminals Joliet Hldgs. LLC v. CenterPoint Props. Tr.*, 2023 WL 615997, at *8 (Del. Super. Ct. Jan. 23, 2023).

[46] *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997).

are filed and neither party argues the existence of a genuine issue of material fact, 'the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the[m].'"[47] "If the Court finds that no genuine issues of material fact exists, and the moving party has demonstrated [its] entitlement to judgment as a matter of law, then summary judgment is appropriate."[48]

## IV. DISCUSSION

The Court first must interpret the relevant provisions of the Mark III Asset Purchase Agreement, beginning with Section 4.12(d) and its accompanying Schedule, and then Section 3(a) concerning Conditional Use Permit reimbursement. Upon construing those provisions, the Court finds that Mark III breached the Mark III APA by failing to provide the warranted access to the Carbon County Site and by refusing reimbursement of certain Conditional-Use-Permit-related expenses. The Court next turns to the Wyomedia Asset Purchase Agreement to determine whether Wyomedia conveyed "good leasehold title" to the Rawlins Hill Site. The

---

[47]  *Radulski*, 2020 WL 8676027, at *4 (alteration in original) (quoting Del. Super. Ct. Civ. R. 56(h)).

[48]  *Brooke v. Elihu-Evans*, 1996 WL 659491, at *2 (Del. Aug. 23, 1996) (citing *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322, 325 (Del. Super. Ct. 1973)); *see also Jeffries v. Kent Cty. Vocational Tech. Sch. Dist. Bd. of Educ.*, 743 A.2d 675, 677 (Del. Super. Ct. 1999) (citing *Mitchell v. Wolcott*, 83 A.2d 759, 761 (Del. 1951)) ("However, a matter should be disposed of by summary judgment whenever an issue of law is involved and a trial is unnecessary.").

Court concludes that it didn't and that Wyomedia therefore breached its APA. Finally, because damages have not yet been determined, the Court declines to order release of escrow funds or award attorneys' fees at this stage. Accordingly, Defendants' Partial Motion for Summary Judgment is **GRANTED**, and Plaintiffs' Motion for Summary Judgment is **DENIED**.

## A. MARK III BREACHED ITS ASSET PURCHASE AGREEMENT WITH BIG HORN.

The Mark III APA dispute turns on two questions of contract interpretation. *First*, did Mark III warrant access to the Carbon County Site? *Second*, is Mark III required to reimburse Big Horn for Conditional Use Permit related expenses? Upon answering these questions, the Court finds that Mark III breached its representations to Big Horn: Mark III warranted indirect access to the Carbon County Site—which was not provided, and Big Horn was permitted to request out-of-pocket Conditional Use Permit-related expenses—which Big Horn didn't receive.

### 1. Mark III APA Section 4.12(d) warrants access to the Carbon County Site; that provision was breached.

Did the Mark III APA warrant access to the Carbon County Site? Of course, the answer turns on contract interpretation. Specifically, the Court must determine how Section 4.12(d) and Schedule 4.12(d) work together and what they represent about access to the properties.

Section 4.12(d) provides:

> <u>Except as set forth in Schedule 4.12(d)</u>, **all of the Real Property has direct access to public roads or streets (or, if not direct access, Seller has the legal and transferrable right either by easement or license to such commercially reasonable access as is necessary for the operation of the Stations**), such access is not dependent on any land or other real property interest (including any easement or license that is not part of the Real Property) and all utilities and services necessary for the proper and lawful conduct in all material respects regarding the operation of the Stations . . .[49]

Section 4.12(d) includes an express exception to the access representation "as set forth in Schedule 4.12(d)."[50]  Thus, the Court must read the Schedule alongside the Section.  Schedule 4.12(d) titled "Real Property – Exceptions to Access," provides:

> None of the real property has direct access to public roads except the property located at 1856 Skyview Drive, Casper, Wyoming, and the office building located at 2220 Dell Range Blvd.[51]

The schedule makes plain that only the Skyview Drive and Dell Range Boulevard properties have direct access.  That much is clear.

But the real contest is over what the Schedule means when coupled with the Section's parenthetical: "(or, if not direct access, Seller has the legal and transferrable right either by easement or license to such commercially reasonable access as is necessary for the operation of the Stations)[.]"[52]  Both parties posit the

---

[49]   Mark III APA § 4.12(d) (emphasis added).

[50]   *Id.*, Schedule 4.12(d).

[51]   *Id.*

[52]   *Id.*

language is unambiguous.  They disagree sharply, however, on the meaning of the "unambiguous" provisions.[53]

Mark III argues that the Schedule disclaimed all access besides those listed therein—so, the Carbon County Site is without any access warranty.[54]  Big Horn argues that the Schedule may disclaim direct access to the Carbon County Site, but that Section 4.12(d) still guarantees commercially reasonable indirect access for the property.[55]

In interpreting contractual language, Delaware courts begin with the written instrument itself.[56]  Delaware courts follow the "objective theory of contracts," which requires interpreting a contract as it would be understood by an objective, reasonable third party.[57]  The Court must prioritize the parties' intentions as expressed in the contract itself, and "Delaware courts will not destroy or twist

[53]  Defs.' Op. Br. PMSJ, 46–47 ("Therefore, because the language of the Mark III – Big Horn APA is unambiguous, and Schedule 4.12(a) only disclaimed direct access to the Carbon County Property, Plaintiffs' argument that Mark III specifically excepted the Carbon 47 County Tower site from the access representation necessarily fails."); Pls.' Op. Br. MSJ, 1, 26–31 ("[a]s detailed below, the contract language is clear that Plaintiffs made no such representation or warranty.").

[54]  Pls.' Op. Br. MSJ, 28–30.

[55]  Defs.' Op. Br. PMSJ, 41–47.

[56]  *Gunderson v. Trade Desk, Inc.*, 326 A.3d 1264, 1280 (Del. Ch. 2024) ("Delaware courts start with the text. And if the text is unambiguous, Delaware courts end there too.").

[57]  *Vinton v. Grayson*, 189 A.3d 695, 704 (Del. Super. Ct. 2018) (quoting *Osborn ex rel. Osborn v. Kemp,* 991 A.2d 1153, 1159 (Del. 2010)); *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 475 (Del. Ch. 2022); *Seaford Golf & Country Club v. E.I. duPont de Nemours & Co.*, 925 A.2d 1255, 1260 n.7 (Del. 2007).

[contract] language under the guise of construing it."[58]  "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."[59]  Applying that interpretive framework, the Court must turn to the language of the provision itself and examine its grammatical structure, since the meaning of the parties' agreement is expressed through the specific words and clauses they selected.[60]

The first sentence of Section 4.12(d) contains a main clause—"all of the Real Property has direct access"—and a parenthetical alternative clause—"or, if not direct access, Seller has the legal and transferrable right either by easement or license . . ."[61] The disjunctive "or" establishes *two* alternative factual states that would satisfy the warranty for any given parcel: either "direct access" to public roads or "indirect access"[62] through a legal and transferrable right of access by easement or license.

---

[58]  *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 475 (Del. Ch. 2022) (citing *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)) (alterations in original).

[59]  *Rhone-Poulenc Basic*, 616 A.2d at 1196; *see also Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 555 (Del. Super. Ct.), *aff'd*, 886 A.2d 1278 (Del. 2005).

[60]  *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."); *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) ("When interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement.").

[61]  Mark III APA § 4.12(d).

[62]  "Indirect access" is a shorthand term the Court uses for the parenthetical in the Mark III APA: "(or, if not direct access, Seller has the legal and transferrable right either by easement or license to such commercially reasonable access as is necessary for the operation of the Stations)[.]" Mark

- 12 -

Because "or" is used disjunctively, either condition is sufficient to satisfy the representation. The use of "or" in this way makes grammatical sense here. It is also the most commonly understood meaning and usage of "or" in such contexts.[63]

The introductory dependent clause—"Except as set forth in Schedule 4.12(d)"[64]—functions as a *carve-out* from the scope of the representation.[65] Grammatically, "[e]xcept as set forth"[66] modifies the entire affirmative statement that follows, thereby removing from the scope of the representation any property identified in Schedule 4.12(d). The logical structure is therefore straightforward: all Real Property is represented as having direct or legally enforceable indirect access, except for properties expressly listed as exceptions in the Schedule.

Schedule 4.12(d) provides: "None of the real property has direct access to public roads except the property located at 1856 Skyview Drive, Casper, Wyoming, and the office building located at 2220 Dell Range Blvd."[67] The Schedule simply

---

III APA § 4.12(d).

[63] *See Weinberg v. Waystar, Inc.*, 294 A.3d 1039, 1045 (Del. 2023) ("First, 'and' may be interpreted conjunctively or disjunctively. Many legal authorities support Weinberg's suggestion that ordinarily 'and' is conjunctive, while 'or' is disjunctive, and that courts will construe each word accordingly, absent strong reasons to break from the general rule.").

[64] Mark III APA § 4.12(d).

[65] No doubt, these types of carve-outs are common in contracts. *See Legent Group, LLC et al. v. Axos Financial, Inc. et al.*, 2025 WL 3124529, at *15–16 (Del. Ch. Nov. 7, 2025); *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *80 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018) (discussing carve-outs in the MAE context).

[66] Mark III APA § 4.12(d).

[67] Mark III APA, Schedule 4.12(d).

states which properties have and don't have "direct access."[68] Crucially, however, the Schedule doesn't state that the Seller lacks or is not transferring the as-previously-Section-warranted indirect access to *any* location.[69]

The absence of direct access triggers the second part of the clause, namely that the Seller possesses indirect access—"the legal and transferrable right either by easement or license to such commercially reasonable access as is necessary for the operation of the Stations[.]"[70] In Mark III's view, the structure of the Schedule and the Section operates to exclude the remaining three properties from *any* access warranty, meaning it was not obligated to provide Big Horn with either direct or indirect access to the Carbon County Site.[71] But that interpretation is oppugnant to what is written. Section 4.12(d) states that all property has access either through direct or indirect access except those described in Schedule 4.12(d). Schedule 4.12(d) lists no property without indirect access; it instead identifies two that have direct access and says no other properties have such direct access. A reasonable person would thusly read that the latter representation applies—all the other

---

[68] *Id.*

[69] Mark III APA § 4.12(d), Schedule 4.12(d).

[70] *Id.* § 4.12(d).

[71] Pls.' Op. Br. MSJ, 28–30. Put simply, Mark III interprets the provision as reading: Only the Skyview Drive and Dell Range Blvd. properties "ha[ve] direct access to public roads or streets (or, if not direct access, Seller has the legal and transferrable right either by easement or license to such commercially reasonable access as is necessary for the operation of the Stations)[.]" *See* Mark III APA § 4.12(d).

- 14 -

properties have indirect access.[72] Accordingly, when the operative language is read as a whole, Mark III represented and warranted that the Carbon County Site had indirect access. It doesn't.[73] Mark III breached its representations to Big Horn.

The Parties have set out additional arguments relating to other Mark III APA provisions, including Sections 4.3 (Third Party Consents), 4.4 (Government Consents), and other portions of Section 4.12.[74] The disagreement about these provisions is largely aimed at answering the question of whether the measures required to obtain access to the site is an encumbrance or otherwise fits into representations and warranties about government approval.[75] But one need not resort to these provisions to resolve the dispute here.

The language of Section 4.12(d) alone establishes a breach of the representations and warranties, as the Mark III APA expressly provides that the conveyed properties would have either direct access to public roads or a legal and transferrable right of access by easement or license. That representation was not fulfilled with respect to the Carbon County Site.

---

[72] *See Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, 2015 WL 11120934, at *6 (Del. Super. Ct. Dec. 29, 2015). Mark III invokes interpretive rule *expressio unius est exclusio alterius*—the expression of one thing is the exclusion of the other—but seeks to ascribe a far broader meaning thereto: the non-expression of one thing is the exclusion of all others. *Cf. Salzberg v. Sciabacucchi*, 227 A.3d 102, 120 n.77 (Del. 2020); *see generally* Pls.' Op. Br. MSJ. That's not how it works.

[73] Pls.' Op. Br. MSJ, 5–21.

[74] *See generally* Pls.' Answer, 18–25; Defs.' Op. Br. PMSJ, 55–61; Defs.' Reply, 13–18.

[75] *See generally* Pls.' Answer, 18–25; Defs.' Op. Br. PMSJ, 55–61; Defs.' Reply, 13–18.

- 15 -

Mark III contends that, even if a breach occurred, Big Horn isn't entitled to a remedy because the BLM requires the purchaser to obtain its own right-of-way.[76] Not so. Section 8.3 of the APA expressly provides for indemnification for breaches of representations and warranties.[77] The fact that a purchaser may be responsible for obtaining the right-of-way according to the BLM doesn't absolve Mark III of liability for its breach. In fact, it informs the measure of damages, which is the cost required to secure the access that was represented but not delivered. In short, the practical realities of what could be represented and warranted doesn't affect the Court's legal conclusion of what was represented and warranted[78]—at least to the extent that the Court reads the provision under the reasonable person standard of contract interpretation.[79]

Mark III breached the Mark III APA by failing to provide Big Horn with indirect access to the Carbon County Site; Big Horn's cross-motion for partial

---

[76]   Pls.' Answer, 26–28.

[77]   Mark III APA § 8.3.

[78]   This is the fundamental purpose of representations and warranties. *See Interim Healthcare*, 884 A.2d at 548 ("[T]he extent or quality of plaintiffs' due diligence is not relevant to the determination of whether [Seller] breached its representations and warranties in the Agreement. To the extent [Seller] warranted a fact or circumstance to be true in the Agreement, plaintiffs were entitled to rely upon the accuracy of the representation irregardless of what their due diligence may have or should have revealed. In this regard, [Seller's] accepted the risk of loss . . . in the event [of] its . . . breach[].").

[79]   *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1211 (Del. 2021) ("Delaware courts read contracts as a whole, and interpretations that are commercially unreasonable or that produce absurd results must be rejected."); *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) ("An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.").

summary judgment is **GRANTED** on its Count I and Count II claims. The only question remaining is damages.

### 2. **Mark III must pay Big Horn's reasonable out-of-pocket costs and expenses in seeking to obtain a Conditional Use Permit.**

The second question before the Court arises from the role of the 120-day period set out in Section 3(a). The Section allows for Big Horn to recoup expenses it pays on obtaining a Conditional Use Permit ("CUP") or for reducing the size or dismantling the towers on the site.[80] The parties dispute whether Section 3(a) of the Mark III APA amendment requires Big Horn to have applied for a CUP within 120 days of closing, or whether the 120-day provision applies only to Big Horn's option to be reimbursed for dismantling, reducing, or disposing of the towers located on the Carbon County Site.[81] Mark III asserts that Big Horn's failure to file a CUP application or to dismantle or reduce the towers within 120 days bars its claim for reimbursement.[82] Big Horn counters that the 120-day provision doesn't apply to its right to reimbursement for costs and expenses incurred in seeking to obtain a CUP and that nothing in the language of the contract conditions reimbursement on filing a formal CUP application.[83] The provision is as follows:

---

[80] Amendment to Mark III APA§ 3(a).

[81] Pls.' Op. Br. MSJ, 16–21; Defs.' Op. Br. PMSJ, 64–68.

[82] Pls.' Op. Br. MSJ, 16–17, 21; Pls.' Answer, 29–30.

[83] Defs.' Op. Br. PMSJ, 64–68; Defs.' Reply, 20–22.

3. <u>Carbon County Tower Site</u>.

(a) Reference is hereby made to the Seller's Owned Real Property in Carbon County, Wyoming as more particularly described on Schedule 4.12(a) to the Purchase Agreement (the "Carbon County Site"). Following the Closing, the Seller agrees to cooperate with, and use commercially reasonable efforts to assist, the Purchaser in obtaining a conditional use permit to use, own and operate the towers on such site (the "Towers") as required under applicable local zoning ordinances (a "CUP"). In applying for a CUP, the Purchaser will use Wyoming counsel experienced in Carbon County zoning matters and will consult with the Seller before the Purchaser commissions any kind of study that may be needed. If the Purchaser does not secure a CUP within one hundred (120) days following the Closing, then, at the Purchaser's option, the Seller agrees to promptly reimburse the Purchaser for its reasonable out of pocket costs in dismantling the Towers and disposing of the same or reducing the height of the Towers below 80 ft to be in zoning compliance. The Seller agrees to promptly (within 10 business days) reimburse the Purchaser for all of the Purchaser's reasonable out of pocket costs and expenses in seeking to obtain a CUP up to $75,000.[84]

The Court "will not ignore a contract's language . . . when doing so would essentially constitute 'add[ing] a limitation not found in the plain language of the contract.'"[85] This is because, "[a]s a general proposition, for a court to add a limitation that is not found within the express language of the contract is untenable."[86] "Delaware courts will not allow 'sloppy grammatical arrangement of

---

[84] Amendment to Mark III APA § 3(a) (emphasis omitted).

[85] *Rag Am. Coal Co. v. AEI Res., Inc.*, 1999 WL 1261376, at *5 (Del. Ch. Dec. 7, 1999) (citing *E.I. du Pont de Nemours & Co. v. Green*, 411 A.2d 953, 956 (Del. 1980); *see also Silver Lake Off. Plaza, LLC v. Lanard & Axilbund, Inc.*, 2014 WL 595378, at *7 (Del. Super. Ct. Jan. 17, 2014).

[86] *Alpine Inv. Partners v. LJM2 Cap. Mgmt., L.P.*, 794 A.2d 1276, 1286 (Del. Ch. 2002), as revised (Mar. 28, 2002); *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005)

the clauses or mistakes in punctuation to vitiate the manifest intent of the parties as gathered from the language of the contract.'"[87]

With all this in mind, a closer look at the provision's wording shows how the 120-day period fits into the parties' respective obligations. The 120-day provision serves a timing function, but it doesn't set a deadline for obtaining or applying for a CUP.[88] Instead, it establishes the point when the Purchaser gains an alternative right: If the Purchaser doesn't secure a CUP within 120 days of closing, it may choose to dismantle, dispose of, or reduce the towers, and the Seller must reimburse those costs.[89] But the Purchaser could not request expenses for reduction in the towers immediately—it must wait the 120-day period. Its right to reimbursement for expenses incurred in seeking to obtain a CUP stands apart from the 120-day timeline. There, the contract expressly obligates the Seller to reimburse the Purchaser "for all of the Purchaser's reasonable out of pocket costs and expenses in seeking to obtain

---

("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").

[87] *Segovia v. Equities First Holdings, LLC*, 2008 WL 2251218, at *9 (Del. Super. Ct. May 30, 2008) (citing *Interim Healthcare*, 884 A.2d at 555).

[88] Amendment to Mark III APA ("In applying for a CUP, the Purchaser will use Wyoming counsel experienced in Carbon County zoning matters and will consult with the Seller before the Purchaser commissions any kind of study that may be needed. If the Purchaser does not secure a CUP within one hundred (120) days following the Closing, then, at the Purchaser's option, the Seller agrees to promptly reimburse the Purchaser for its reasonable out of pocket costs in dismantling the Towers and disposing of the same or reducing the height of the Towers below 80 ft to be in zoning compliance.").

[89] *Id.*

- 19 -

a CUP up to $75,000,"[90] without reference to any timeframe. The contract places the $75,000 reimbursement as Seller's own affirmative obligation, free of conditional or temporal modifiers. The 120-day timeline is wholly unrelated to the "seeking to obtain a CUP."[91]

Mark III argues that, read this way, the provision allows for an unlimited time that Big Horn could seek the $75,000 reimbursement.[92] It doesn't. It is a fundamental principle of contract law that if no time for performance is fixed in contract, then the Court can imply a reasonable time.[93] The Mark III APA closed on June 4, 2020,[94] and that the second and final escrow installment was to be released 15 months after closing.[95] Big Horn submitted its Notice of Claim on June 2, 2021, seeking reimbursement for its CUP-related expenses months before the release of the escrow funds.[96] That is reasonable.

---

[90] *Id.*

[91] *Id.*

[92] Pls.' Answer, 29 ("Defendants' interpretation would also yield an illogical and absurd result, whereby Mark III has an endless obligation to pay costs associated with Big Horn obtaining a CUP. Under such interpretation, there would be no limit on the amount of time Big Horn could wait to obtain a CUP and impose the costs on Mark III.").

[93] *Martin v. Star Pub. Co.*, 126 A.2d 238, 244 (Del. 1956) ("If no time for performance is fixed [in a contract], the court will imply a reasonable time"); *Salisbury v. Credit Serv.*, 199 A. 674, 683 (Del. Super. Ct. 1937) ("[A]pplying the usual rule that where no time for the performance of a contract is fixed by it, the law will assume that a reasonable time is intended.")

[94] Compl. ¶ 15; Defs.' Countercl., 7.

[95] Mark III APA § 2.3(c) ("On the date that is fifteen (15) months after the Closing Date, the Escrow Agent will pay to the Seller the portion of the interest and earnings on the Indemnity Escrow and any amounts remaining in the Indemnity Escrow").

[96] Compl. Ex. E.

Accordingly, the Court finds that Section 3(a) doesn't require Big Horn to apply for a CUP within 120 days of closing as a condition to reimbursement. Big Horn's motion for partial summary judgment is **GRANTED** as to Count I and Count II with regard to the Mark III APA breaches.

## B. WYOMEDIA, LIKEWISE, BREACHED ITS ASSET PURCHASE AGREEMENT WITH FRONT RANGE.

This next issue arises from the sale of broadcasting assets by Wyomedia to Front Range. Among those assets was Wyomedia's interest in the Rawlins Hill Site—a communications tower location situated on federal land administered by the BLM.[97] The Parties agree that for years Wyomedia had operated facilities at Rawlins Hill under a Communications Use Lease issued by BLM.[98] That lease expired prior to closing, but Wyomedia continued to occupy the site and to remit annual rental payments to BLM.[99] In the Wyomedia APA, Wyomedia made the following representation:

> 4.12 Real Property
>
> Schedule 4.12(c) lists the Leased Real Property, which is all of the real property leased to the Seller and used or held for use in connection with the Stations. Except as set forth on Schedule 4.12(c), the Seller has good leasehold title to its interests in the Leased Real Property, free and clear of all Encumbrances, except for Permitted Encumbrances. All Improvements located on the

---

[97] Pls.' Op. Br. MSJ, 2–3; Defs.' Op. Br. PMSJ, 33.

[98] Compl. ¶¶ 36–38; Pls.' Op. Br. MSJ, 2–3; Defs.' Op. Br. PMSJ, 30–33.

[99] Compl. ¶¶ 36–38; Pls.' Op. Br. MSJ, 2–3; Defs.' Op. Br. PMSJ, 30–33.

Leased Real Property (i) are in reasonable condition and repair in accordance with normal and customary industry practices (ordinary wear and tear excepted), and (ii) are available for immediate use in the operations of the Stations as currently conducted. With respect to the Leased Real Property, the Seller is in peaceable possession under each such Real Property Lease. Each of the Leases relating to the Stations is accurately identified and described (including the address of the Leased Real Property) on Schedule 4.12(c), and each Lease is in full force and effect, and there exists no default or event of default (or condition which, with the giving of notice or the passage of time, or both, would create a default or event of default) on the part of the Seller under any such Lease, nor, to the Knowledge of the Seller, by any Third Party to such Lease. The Seller has provided Purchaser with correct and complete copies of such Leases for the Leased Real Property, including all amendments, schedules, addenda and exhibits thereto.[100]

The Rawlins Hill Lease is listed in Schedule 4.12(c):

**5. Communications Use Lease**, dated as of February 21, 2003, by and between Seller (f/k/a Wyoming Channel 2, Inc.) and United States of America, acting through the Bureau of Land Management, Department of the Interior. Transmitter Information: - KFNR[101]

The record isn't in dispute. When the Parties closed the transaction, the Communications Use Lease for the Rawlins Hill Site had already lapsed.[102] Although Wyomedia had made its rental payments, BLM had not renewed the lease, and Wyomedia didn't possess an enforceable leasehold interest in the property.[103] As part of the Wyomedia APA, Wyomedia represented that it possessed "good

---

[100] Wyomedia APA § 4.12(c) (emphasis omitted).

[101] *Id.* at Schedule 4.12(c) (Updated Schedules) (emphasis in original).

[102] Compl. ¶¶ 36–38; Pls.' Op. Br. MSJ, 2–3; Defs.' Op. Br. PMSJ, 30–33.

[103] Compl. ¶¶ 36–38; Pls.' Op. Br. MSJ, 2–3; Defs.' Op. Br. PMSJ, 30–33.

leasehold title" to the Rawlins Hill Site and that the lease was "in full force and effect."[104] The Rawlins Hill Site was expressly listed in the schedules to the APA as part of the "Leased Real Property."[105]

Against this factual backdrop, Wyomedia insists that Front Range is responsible for securing its own lease, right-of-way, and reclamation bond from the BLM; it cannot shift those obligations back to Wyomedia here.[106] But Wyomedia didn't promise to transfer an opportunity for Front Range to create a property interest; it promised to transfer a property interest it already possessed.[107] The APA warranted "good leasehold title"—not an expired lease and a pathway to potential authorization.[108] Whether the BLM requires the purchaser to post its own bond doesn't relieve Wyomedia of the obligations it voluntarily undertook in the contract; a seller may not redefine its representations to align with a regulatory process after the fact.[109]

Wyomedia represented that it held a valid leasehold interest and legal access

---

[104] Wyomedia APA § 4.12(c), Schedule 4.12(c) (Updated Schedules).

[105] *Id.*

[106] Pls.' Answer, 35; Pls.' Op. Br. MSJ, 38–39.

[107] Wyomedia APA § 4.12(c), Schedule 4.12(c).

[108] *Id.* at § 4.12(c).

[109] The question is whether a purchasing party can rely on a representation, even when the representation cannot be true. A purchaser can, and it may indeed be deemed reasonable to do so. *Interim Healthcare*, 884 A.2d at 548; *In re Dura Medic Holdings, Inc. Consol. Litig.*, 333 A.3d 227, 251 (Del. Ch. 2025); *Cobalt Operating, LLC v. James Crystal Enters., LLC*, 2007 WL 2142926, at *28 (Del. Ch. July 20, 2007).

to the Rawlins Hill Site.[110]  Front Range has established its right to judgment on liability for the Rawlins Hill claim.  Accordingly, Front Range's Motion for Summary Judgment is **GRANTED** under Count I (breach of contract) and Count II (declaratory judgment) with respect to the Rawlins Hill Site.

## C. ESCROW RELEASE AND ATTORNEYS' FEES CANNOT YET BE DETERMINED.

The Parties agree that release of the escrow funds is governed by Section 2 of the Mark III APA and the Wyomedia APA,[111] and that attorneys' fees may be awarded to the prevailing party under Section 9.3 of those agreements.[112]  Sellers seek to resolve these issues now.[113]  But the Court cannot adjudicate nor has even heard argument on the amount of any recoverable damages.  Without such findings, the Court cannot calculate what portion of the escrow, if any, is properly allocable to an indemnification obligation or subject to release.  Nor can it determine which party, if any, has prevailed for purposes of fee-shifting—though given all the above it is doubtful that would be Sellers.

Because both the allocation of escrow funds and any award of attorneys' fees necessarily depend on a final adjudication of damages, Sellers' Motion for Summary Judgment seeking release of escrow and an award of attorneys' fees is **DENIED**.

---

[110]  Wyomedia APA § 4.12(c), Schedule 4.12(c).

[111]  Compl. ¶ 16; Defs.' Countercl. ¶ 48.

[112]  Compl. ¶ 60; Defs.' Countercl. ¶ 46; Mark III APA § 9.3; Wyomedia APA, § 9.3.

[113]  *See generally* Pls.' Op. Br. MSJ.

## VI.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment is **GRANTED**, and Plaintiffs' Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*

_____

Paul R. Wallace, Judge